UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
AT LEXINGTON

KENTUCKY INDUSTRIAL HEMP, LLC,
and ANANDA HEMP INC.,

      **Plaintiffs,**

V.

TETERBORO PARTNERS, LLC, CHIEF
VENTURES, LLC, and MR. NICE GUY,
INC.,

      **Defendants.**

CIVIL ACTION NO. 5:19-496-KKC

<u>OPINION AND ORDER</u>

\*\*\* \*\*\* \*\*\*

This matter is before the Court on Plaintiffs' motions for summary judgment.  (DEs 69, 70, 71-2.)  Defendants having responded (DE 77) and Plaintiffs having replied (DE 78), the matter is now ripe for the Court's review.

**I.**

The Court outlined the basic facts of this case during its previous summary judgment ruling.  (DE 30.)  The Court will briefly recount those facts and provide some additional context that is now relevant. Plaintiffs Kentucky Industrial Hemp, LLC ("Ecofibre Kentucky") and Ananda Hemp, Inc. (together, "Ananda") are hemp product manufacturers. Defendants Teterboro Partners, LLC and Chief Ventures, LLC (together, "Teterboro"), and Mr. Nice Guy, Inc. ("MNG") are business entities that sought to connect Plaintiffs with potential customers for Plaintiffs' products. On April 9, 2018, two entities identified as "Ecofibre/Ananda Hemp" and "Teterboro/Chief" entered into a Sales Agreement.  Plaintiffs and Defendants agree as to the text of the Sales Agreement and its general purpose, which

1

was to govern the payment of commissions by Ananda to Teterboro if Ananda made sales to customers introduced to Ananda by Teterboro.

A little over a year after they executed the Sales Agreement, Ananda and Teterboro signed an Addendum to supplement the original Sales Agreement. Almost six weeks after execution of the Addendum, Ananda sent Teterboro notice of its intent to terminate the Combined Agreement effective six months later on December 1, 2019.

After disagreements between the parties, Plaintiffs filed an action in Harrison Circuit Court on November 12, 2019, and Defendants removed to federal court. Plaintiffs eventually moved for summary judgment on several issues. (DE 15.) At the summary judgment stage, the Court determined that the Plaintiffs properly terminated the Combined Agreement effective December 1, 2019 and that MNG did not have rights under the contract. (DE 30.) However, the Court declined to find the contract invalid and unenforceable, and declined to grant summary judgment on Teterboro's fraudulent inducement counterclaim. (*Id.*)

In anticipation of the pretrial conference, both parties filed motions in limine that raised significant issues inappropriate for quick resolution in the lead-up to trial. After the Court heard statements from counsel at the pretrial conference and a scheduling conflict forced the Court to reschedule the pending trial (DE 67), the Court allowed the parties to submit additional motions for summary judgment to address some of the legal issues raised in the parties' motions in limine. (DE 68.) Plaintiffs submitted three motions for summary judgment: one addressed claims for damages related to future sales of Ananda products (DE 69); one addressed claims for commissions on sales to CVS Health (DE 70); and one addressed Defendants' remaining claims, including those related to breach of contract, tortious interference, fraud, and bad faith (DE 71-2). Defendants responded (DE 77), Plaintiffs replied (DE 78), and the motions are now ripe for the Court's review.

2

**II.**

Fed. R. Civ. P. 56(a) directs the Court to "grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." A party seeking summary judgment bears the initial burden of informing the Court of the basis for its motion with particularity. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The party opposing the motion must then make an affirmative showing of a genuine dispute in order to defeat the motion. *Alexander v. CareSource*, 576 F.3d 551, 558 (6th Cir. 2009). To do so, the non-moving party must direct the Court's attention "to those specific portions of the record upon which it seeks to rely to create a genuine issue of material fact." *In re Morris*, 260 F.3d 654, 655 (6th Cir. 2001).

The Court will draw all reasonable inferences in favor of the non-moving party and determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986). If the Court determines that a rational fact finder could not find for the non-moving party based on the record as a whole, there is no genuine issue for trial, and the Court should grant summary judgment. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

**III.**

Plaintiffs seek summary judgment dismissing Defendants' claims for: (1) damages related to future sales of Ananda products (DE 69); (2) commissions on sales to CVS Health (DE 70); (3) commissions on various other Ananda sales (DE 71-2 at 2–4); (4) breach of contract and tortious interference (*Id.* at 4–6); (5) promissory fraud (*Id.* at 6–8); and (6) bad faith (*Id.* at 8–9). The Court will consider each issue as appropriate.

3

A.      **Contract Interpretation**

In order to evaluate each of the pending issues, the Court must first look at what the contract says. As the parties have previously acknowledged, the interpretation of a contract is a question of law for the Court to decide, *see, e.g.*, *C.A.F. & Assocs., LLC v. Portage, Inc.*, 913 F. Supp. 2d. 333, 342 (W.D. Ky. 2012) (citing *Dowell v. Safe Auto Ins. Co.*, 208 S.W.3d 872, 875 (Ky. 2006)), and the "contract" at issue is the Combined Agreement, consisting of the Sales Agreement and the Addendum.

There appears to be agreement amongst the parties that this is a customer procurement contract (DEs 77 at 13, 78 at 3) and that Teterboro was entitled to commissions when it made introductions to Ananda that directly led to sales.  (DE 68 at 2.)  There also appears to be agreement that if Teterboro made an introduction that directly led to sales, Ananda would continue to pay Teterboro commissions as long as the customer continued to buy Ananda products.[1]  Counsel for Ananda confirmed at the motions in limine hearing (DE 67) that this understanding was correct, even if the introduction occurred prior to termination of the contract[2] and the sales occurred after termination, as long as the introduction directly led to the sales.

There are essentially only two relevant disputes as to the meaning of specific provisions in the contract itself; the rest of the parties' disagreements surround whether

---

[1] *See* DE 15-5 at 35 (Ananda CEO Eric Wang: "My understanding, as long as Teterboro brought a client in for us, I would continue to pay them until that client had ceased being a client of ours, and the client being the end – the end customer who Teterboro introduced and brought on."); *Id.* at 38 ("Q. In your opinion under this agreement would it be permissible for Ecofibre/Ananda to receive introductions from defendants, say, the day after the contract was entered into, April 10, 2018, and turn around and terminate 30 days later without ever paying any commissions? Mr. Jackson: Objection. [Wang:] If that client was introduced and turned into directly a client, then in my opinion that client would fall under this agreement.").

[2] The Court has previously ruled that the Combined Agreement was properly terminated effective December 1, 2019.  (DE 30 at 7–9.)

Teterboro actually performed such that it is entitled to compensation now or in the future (i.e. whether Teterboro made introductions that directly have led or will lead to sales).

The first dispute is whether Teterboro's commission rates are based on gross sales or individual orders. (DEs 77 at 21, 78 at 13.) The relevant portion of the contract is as follows:

> For its services, Teterboro/Chief is working off of a 30% discount of the Ecofibre/Ananda Hemp products wholesale price, provided Teterboro/Chief gross sales exceed $25,000 per month.
> - Ananda will pay the 30% commission and direct ship orders over $25,000 at the standard wholesale price. Any pricing differences below standard wholesale price will be managed by Teterboro/Chief and the client.
> - Any orders smaller than $25,000 where Ananda handles the shipping and payments collection will see a commission as follows:
> o $15,000-$24,999: Ananda ships to clients and commission to Teterboro/Chief is 20%
> o $5,000 to $14,999: Ananda ships to clients and the commission to Teterboro/Chief is 15%
> o no orders below $5,000

(DE 1-1 at 6). As Defendants point out, an unambiguous contract must be strictly enforced according to the plain meaning of its express terms. *Allen v. Lawyers Mut. Ins. Co. of Kentucky*, 216 S.W.3d 657, 659 (Ky. App. 2007). The plain meaning of the express terms here—which were drafted by Teterboro (DEs 15-1 at 8, 15-2 at 6)—is clear. As long as Teterboro/Chief gross sales exceeded $25,000 per month, Teterboro was ***working off of*** a 30% discount on the wholesale price. For any ***orders*** smaller than $25,000 where Ananda handled shipping and payments collection, Teterboro would receive a 20% commission on orders from $15,000 to $24,999, a 15% commission on orders from $5,000 to $14,999, and no commission on orders below $5,000. The Court finds the language of the contract unambiguous on this point, but, if one were to find the contract ambiguous, a look at the parties' own statements would seem to support the plain text of the agreement.[3] Thus, Teterboro's specific commission rates were based on orders, not gross sales.

---

[3] *See* DE 15-1 at 13–14 ("Q. Where in the sales agreement does it say that the commission rate for orders below $5000 is 15 percent? [Egan:] I believe it's implied. It doesn't have to state it entirely. . . .

The second dispute is over the meaning of the phrase: "This Agreement affirms non-circumvent."  (DE 1-1 at 6.)   At the motions in limine hearing (DE 67), the parties acknowledged, and the Court agrees, that this contract did not make Teterboro Ananda's exclusive broker. Teterboro has not exactly provided a clear explanation of what it thinks this non-circumvention provision means, but it appears to understand it as a prohibition on Ananda "selling, directly and indirectly through third parties, to customers introduced to them by Defendants and customers identified on Defendants' contact list without paying commissions." (DE 77 at 23.) Ananda proffers that the provision "merely affirmed that, **once Defendants had secured a customer for Ananda** . . ., Ananda could not deal directly with that customer without owing Defendants commission for such sales."  (DE 70 at 11) (emphasis in original.)   Thus, the parties seem to agree that if Teterboro made an introduction that directly led to sales, Ananda would not be able to cut Teterboro out and not pay it commissions on those sales. That is essentially another way of describing a breach of the contract. The disagreement is over Teterboro's expansive understanding of the provision, which is that Ananda must also pay commissions on sales to any customer introduced to it by Teterboro or on Teterboro's contact list, regardless of whether Teterboro's introduction directly led to sales. In Kentucky law, "circumvent" is most often used in the context of a property owner intentionally delaying the sale of a property to a customer procured by an agent or broker in order to "circumvent" the agent's right to a commission. *See Eitel v. Owen*, 284 S.W.3d 147, 148 (Ky. App. 2008); *Reedy v. Beauchamp*, 211 S.W.2d 393, 412 (Ky. 1948); *C. Robert Peter & Co. v. Fix*, 7 S.W.2d 1040, 1041 (Ky. 1928). In this line of cases, it is not considered "circumvention"—and the broker is not entitled to a commission—if "the broker

Q. But isn't that exactly what the sales agreement says, no orders below $5000? [Egan:] It does. That's why we're wondering why they didn't continue that onto the account. Q. At any point during negotiations of the sales agreement, did the parties discuss a commission rate for orders below $5000? [Egan:] No.").

6

abandons negotiations and the owner of the property afterwards in good faith resumes the negotiations, followed by a sale of the property" or "if the owner in good faith withdraws the property pursuant to a right to do so and afterwards sells it, even to a prospect discovered and furnished by the agent[.]" *Fix*, 7 S.W.2d at 1041. While this agreement is not perfectly analogous to the real estate context, that understanding of "circumvent" from Kentucky caselaw is reasonable here. According to BLACK'S LAW DICTIONARY, "affirm" means to "confirm, ratify, or approve (a lower court's judgment) on appeal." BLACK'S LAW DICTIONARY (11th ed. 2019). Thus, the provision "This Agreement affirms non-circumvent" would confirm that Ananda cannot intentionally avoid paying commissions on sales to customers procured by Teterboro. This analysis of the ordinary meaning of contract's terms aligns with the understanding offered by Ananda. The choice of "affirms" (i.e. confirming something already stated) further underscores Ananda's understanding that this five-word sentence was essentially just reiterating that circumvention would be a breach of contract. Teterboro's proposed understanding—that this five-word sentence contained an implied expansion of the contract, never discussed[4] by any of the parties, to cover customers introduced by Defendants and customers identified on Defendants' contact list, even if the introductions did not directly lead to sales—is simply unreasonable. Thus, the only reasonable understanding of the non-circumvention provision is that conveyed by the plain meaning of its terms: if Teterboro made an introduction that directly led to sales (i.e. procured a customer), Ananda would not be able to cut Teterboro out and not pay it commissions on those sales (i.e. circumvent).

---

[4] *See* DE 15-1 at 9 ("[Egan:] Both parties comprehended and understood what that meant. . . . I would imagine with a high-level Ivey [sic] League degree that Mr. Wang possesses that he would fully comprehend what . . . non-circumvent means. Q. Do you recall if the parties negotiated that term at all? [Egan:] I don't believe so."); DE 15-2 at 21 ("Q. Did the parties discuss this phrase ["non-circumvent"] when they were negotiating the Sales Commission Agreement? [O'Rourke:] No. It's kind of like, you know, when you're at the ball field, they offer you hotdogs and a beer. This is people who do this, no. . . . None of us gave that a second thought. We all know what it means.").

**B.    Customers Claimed by Teterboro to Whom Sales Have Been Made**

Plaintiffs move for summary judgment declaring that Defendants are not entitled to commissions on sales to CVS Health, KeHe Distributors, Wegmans Markets, SuperValu, and Dutch East Trading Company.  (DEs 70, 71.)

### 1. CVS Health

Ananda argues that it does not owe commissions to Teterboro on sales made to CVS because Teterboro was not the effective or procuring cause of Ananda's sales to CVS and because no sales to CVS occurred during the term of the agreement. Teterboro takes issue with both of these arguments.

Teterboro states that the procuring cause doctrine has no application "because the Commission Agreement is for customer procurement, not sales procurement" (DE 77 at 13), but it does not reconcile that position with its stated understanding that the agreement required an introduction that directly led to sales (i.e. *procurement* of a customer) for Teterboro to receive commissions.  Defendants cite *Lilley v. BTM Corp.*, 958 F.2d 746, 751 (6th Cir. 1992) to support their proposition, but they do not explain how *Lilley* forecloses Plaintiffs' position. *Lilley* explains that a customer procurement contract "allows an agent to recover a commission for all sales to a customer that the agent *procured* regardless of whether the agent was involved in the particular sale." *Id.* (emphasis added). Plaintiffs' position is that Teterboro did not procure CVS as a customer when it introduced Plaintiffs to Courtney Hopkins and Hopkins—on behalf of CVS—declined to do business with Plaintiffs. This is perfectly harmonious with the explanation of customer procurement contracts in *Lilley*.

Defendants also cite *Dietrich v. Bell, Inc.*, 554 F. App'x 418 (6th Cir. 2014) in support of their position and again do not explain how *Dietrich* is incompatible with Plaintiffs'

position. As the Sixth Circuit explains in *Dietrich*, while a customer procurement contract does not require the representative to book each individual sale to receive a commission, it *does* require that the representative procure a customer (i.e. someone to whom sales are made). *Id.* at 422–23. Again, it is Plaintiffs' position that Teterboro did not procure CVS as a customer.

While the majority of the procuring cause doctrine caselaw deals with procuring cause in the context of sales procurement, the same principles can be applied to customer procurement in a way compatible with both parties' understanding of this agreement. *See Arsham v. Banci*, 511 F.2d 1108, 1115 (6th Cir. 1975) (finding that a broker could not recover when its introduction to one set of employees of a business did not lead to sales and the seller later made sales to the business as a result of an independent effort to engage other employees of the business); *Helm Co., LLC v. Al J. Scheinder Co.*, No. 2013-CA-001192-MR, 2014 WL 4802909, at *10 (Ky. App. Sept. 26, 2014) (citing *Brooks v. Tipton*, 183 S.W.2d 496, 498 (Ky.1944)) (explaining that a procuring cause claim required evidence that the broker claiming a commission "set in motion the machinery by which the work was done, which without break in its continuity, was the procuring cause of the sale."); *Merten v. Vogt*, 208 S.W.2d 739, 741 (Ky. 1948) (explaining how "abandonment" can thwart a broker's claim for commissions on sales to a purchaser originally introduced by the broker).

Here, the Court must assess, after drawing all reasonable inferences in favor of Teterboro, whether no rational fact finder could find Teterboro procured CVS as a customer or whether there are genuine issues of material fact for trial.

It is undisputed that Teterboro did not have an existing relationship with CVS when it contacted CVS in August 2018.  (DE 15-1 at 27.)  It is also undisputed that Teterboro introduced Eric Wang to Courtney Hopkins, Director of Vitamins, Diet & Nutrition in the

Consumer Healthcare division at CVS, and set up a meeting for them in October 2018.  (DE 15-5 at 76.)  Ananda's contact with Hopkins continued, and Laurie Clark—another Ananda broker—reached out to Hopkins in February 2019, at which point Hopkins informed her that she had passed on doing business with Ananda.  (DE 77 at 8.)

It is also undisputed that Laurie Clark had a 20-year relationship with Brenda Lord (DE 70-4 at 11), the Vice President of Store Brands at CVS, and that Lord had not heard of Ananda until Clark introduced her to Ananda in January 2019.  (DE 70-4 at 7, 16–17.)  According to Lord, Ananda was referred to her by Laurie Clark only,[5] not by Courtney Hopkins or someone in her division[6] and not by Teterboro.[7] After Clark introduced Lord to Ananda, Lord included Ananda in a competitive request for bid process with approximately 50 potential hemp suppliers.  (DE 70-4 at 22.)  Lord, Hopkins, and Stacey Hagge—another member of CVS's Store Brands division—all confirm that neither Hopkins, nor anyone from Hopkins' division was involved in the competitive request for bid process run by Lord that eventually resulted in a business relationship between Ananda and CVS.[8]

---

[5] DE 70-4 at 12 ("Q. Okay. And was [Laurie Clark] the one who introduced you to Ananda and its products? [Lord:] She was.").

[6] Id. at 18 ("Q. Okay. But just kind of to summarize, Ananda wasn't referred to you by Courtney Hopkins or anyone from the national brand side of CVS? [Lord:] That is correct. Ms. Mattingly: Objection to form.").

[7] Id. at 22 ("Q. Okay. Okay. And to your knowledge, did Lou Eagan, Tom O'Rourke, Mr. Nice Guy, Teterboro Partners or Chief Ventures have any role in your being introduced to Ananda or your selecting Ananda? [Lord:] No.").

[8] Id. at 19 ("Q. Did Courtney Hopkins or anyone from the national brands side have any input or involvement in the private brand groups' decision to select Ananda? [Lord:] I don't believe so."); DE 70-2 at 9–10 ("Q. So you never were involved in the decision of whether or not to approve -- were you ever involved in the decision of whether or not to approve Ananda as a private brand label? [Hopkins:] No. Q. For CVS? [Hopkins:] No. Q. Did you participate in that process in any way? [Hopkins:] No. . . . Q. And the decision of whether or not to approve Ananda as a private brand supplier would have been under Brenda Lord's division? [Hopkins:] Yes. Q. And you had nothing to do with that? [Hopkins:] Correct. Q. Do you recall having any influence in that selection at all? [Hopkins:] None. Q. Okay. Did you refer or recommend Ananda to anyone on that side? [Hopkins:] No."); id. at 26 ("Q. And I think you've already told me this, but as I understand your testimony, you had no role or input whatsoever into the sales by Ananda Balans Labs products to private brands, where the selection of Ananda is a private label supplier. [Hopkins:] Not involved."); DE 70-5 at 7–8 ("Q. . . . [W]ould the people on the national brands side have anything to do with the private brands

In order to survive summary judgment, the non-moving party must direct the Court's attention "to those specific portions of the record upon which it seeks to rely to create a genuine issue of material fact." *In re Morris*, 260 F.3d at 655. Teterboro does not do so. For example, Teterboro argues that "Plaintiffs' [sic] entirely omit the fact that their chief executive officer admitted that Defendants' first introduced them to CVS." (DE 77 at 16.) However, that is not in dispute—Plaintiffs' position is that the introduction did not lead to sales. Teterboro points to various other facts that it accuses Plaintiffs of downplaying or omitting (DE 77 at 17–18), but none of these facts create a genuine dispute over the salient issue: whether Teterboro's introduction of Ananda to Courtney Hopkins directly led to Ananda's sales to CVS. Teterboro does not cite any evidence that might allow a rational fact finder to determine that Teterboro's introduction to Hopkins rather than Clark's introduction to Lord procured CVS as a customer. The testimony of the most relevant witnesses, namely Hopkins and Lord, is entirely clear and uncontradicted on this issue.

Accordingly, the Court finds that Defendants have no claim to commissions on the sales made to CVS.

### 2. KeHe Distributors

Next, Ananda argues that it does not owe commissions to Teterboro based on transactions with KeHe because Ananda met with KeHe before Teterboro contacted KeHe and because KeHe refused to pay Ananda and returned all of its merchandise. (DE 71-2 at 3.) Teterboro argues that the refusal to pay and the return of the merchandise is "irrelevant." (DE 77 at 21.) However, that view contradicts the understanding of the contract admitted by Teterboro and the plain text of the contract. As the Court has

---

sale or the decision to take on a company as a private brands supplier? [Hagge:] No, they would not.").

repeatedly discussed, both parties agree that the contract provides for commissions based on introductions that directly led to sales. If KeHe never paid Ananda for product and ultimately returned all product to Ananda (DE 71-3 at 3), no sale was made. This is consistent with the plain text of the contract which states: "All orders required payment at delivery. Ananda does not extend terms." (DE 1-1.) The contract clearly does not anticipate that Ananda would pay Teterboro commissions in the event that Ananda shipped product to a company that refused to pay and subsequently returned the product.

Accordingly, the Court finds that Defendants have no claim to commissions on the product shipped to and subsequently returned by KeHe.

### 3. Wegmans Markets

Ananda further argues that it does not owe Teterboro commissions on sales made to Wegmans because Ananda was introduced to Wegmans by another broker before Teterboro claims to have contacted Wegmans and because Ananda made sales to Wegmans before it was notified that Teterboro had even contacted Wegmans. (DE 71-2 at 3–4.) Teterboro claims that Plaintiffs "readily admit, this is highly disputed" (DE 77 at 20) and cite a page of Plaintiffs' brief, but the cited page contains no such admission.

The sworn declaration of Chuck Schneider states that Ananda was first introduced to Wegmans in 2017 by a broker named Market Hub and that Ananda first sold product to Wegmans on January 8, 2019. (DE 71-3 at 3.) Teterboro claims that it sent an email to a Wegmans' Health and Beauty buyer in October 2018 and informed Schneider of this attempted introduction via email on January 20, 2019. (DE 15-4 at 15.) Again, Teterboro must point to specific portions of the record which indicate a genuine issue of material fact in order to survive summary judgment. Chuck Schneider has declared under penalty of perjury that Market Hub introduced Ananda to Wegmans in 2017. Teterboro has stated that it informed Schneider on January 20, 2019—after Ananda had already sold product to

12

Wegmans—that Teterboro had sent an introductory email to Wegmans. Teterboro has pointed to no evidence that might allow a rational fact finder to determine that Teterboro procured Wegmans as a customer.

Accordingly, the Court finds that Defendants have no claim to commissions on the sales made to Wegmans.

### 4. SuperValu

Ananda additionally argues that it does not owe Teterboro commissions on sales made to SuperValu because Ananda was introduced to SuperValu by another broker before Teterboro claims to have contacted SuperValu and because Teterboro never notified Ananda that it contacted SuperValu.  (DE 71-2 at 3–4.)  Teterboro again claims that Plaintiffs "readily admit, this is highly disputed" (DE 7 at 20) and cite a page of Plaintiffs' brief, but the cited page contains no such admission.

The sworn declaration of Chuck Schneider states that Ananda was first introduced to SuperValu through a contact that Ananda's Josh Askin made with SuperValu in April 2018 and that Ananda first sold product to SuperValu on February 13, 2019.  (DE 71-3 at 3.)  Teterboro claims that it sent an introductory email to SuperValu in August 2018 and was informed that SuperValu was working directly with Plaintiffs.  (DE 15-4 at 15.)  Again, Teterboro must point to specific portions of the record which indicate a genuine issue of material fact in order to survive summary judgment. Chuck Schneider has declared under penalty of perjury that Ananda's introduction to SuperValu was made by Josh Askin in April 2018. Teterboro has pointed to no evidence that might allow a rational fact finder to determine that Teterboro procured SuperValu as a customer.

Accordingly, the Court finds that Defendants have no claim to commissions on the sales made to SuperValu.

### 5. Garden State Growers & Dutch East Trading Company

The final past sales on which Ananda seeks summary judgment are those involving Garden State Growers and Dutch East Trading Company. Ananda states that it has paid Teterboro all commissions due through March 2020 for sales to Wakefern Food Corporation, a customer procured by Garden State Growers, a sub-agent of Teterboro. There is an additional $60,368.88 in total product—of which two invoices, one for $5,220 and one for $6,840, would be commissionable—that Wakefern has refused to pay for and seeks to return. (DE 71-3 at 4.)  Ananda stipulates that it will "**pay commissions on these orders, at the contractual rate of 20%, *i.e.*, $2,412 ($12,060 x .20), if and when Wakefern pays.**"  (DE 71-2 at 5) (emphasis in original.)  Teterboro contends that it is entitled to commissions on that product now, based on the gross sales figures, for the same reasons stated regarding the shipments to KeHe. Teterboro also claims commissions on sales to a Garden State Growers subsidiary, Dutch East. Ananda states that these Dutch East sales were made in five separate orders, all below $5,000, meaning Teterboro is not entitled to any commissions on the orders.  (DE 71-3 at 4.)

As the Court explained above as to the KeHe shipments, *supra* Section III.B.2., Ananda is not required to pay commissions on shipments for which a customer refuses to pay because no sale has been made. Additionally, as the Court explained above, *supra* Section III.A., the agreement contemplates commission payments being based on orders, not gross sales.

Accordingly, the Court finds that Defendants have no claim to commissions on the sales made to Dutch East and are only entitled to the commissions that Ananda has agreed to pay for the Wakefern orders, if and when Wakefern pays.

**C.      Teterboro's Remaining Counterclaims for Breach of Contract, Tortious Interference, and Fraudulent Inducement**

Teterboro alleges counterclaims for breach of contract, fraudulent inducement, and tortious interference, primarily as relates to the interactions between Ananda, Garden State Growers, and Dutch East. All of the foregoing analysis illustrates why these claims fail.

A successful claim for breach of contract would require proof of: (1) the existence of a contract between Ananda and Teterboro, (2) a breach of that contract by Ananda, and (3) proof that the breach caused damages to Teterboro. *EQT Prod. Co. v. Big Sandy Co., L.P.*, 590 S.W.3d 275, 293 (Ky. App. 2019). Defendants' remaining breach of contract claim is based on the sales to Dutch East and Garden State Growers (DE 77 at 21–22) analyzed above, *supra* Section III.B.5. The Court determined, *supra* Section III.B.5, that there was no breach of contract regarding those sales, and Defendants point to no other basis for a breach of contract claim.

A successful claim for fraudulent inducement would require proof that: (1) Ananda made a material representation; (2) the representation was false; (3) Ananda knew the representation was false or made the representation recklessly; (4) Ananda made the representation with the intention that it be acted on; (5) Teterboro acted upon the representation in reliance thereon; and (6) this caused injury to Teterboro. *Preferred Care of Delaware, Inc. v. Crocker*, 173 F. Supp. 3d 505, 523 (W.D. Ky. 2016) (citing *PCR Contractors, Inc. v. Danial*, 354 S.W.3d 610, 613 (Ky. Ct. App. 2011)). Defendants' fraudulent inducement claim is based on the non-circumvention provision of the contract.  (DE 77 at 22–23.)  Based on the more limited record before the Court during the previous round of summary judgment submissions, the Court declined to grant summary judgment on this claim.  (DE 30 at 12–13.)  However, it is now clear to the Court that this claim cannot survive summary judgment. Defendants allege that "Plaintiffs' representations were false because they repeatedly

15

circumvented the Commission Agreement by selling, directly and indirectly through third parties, to customers introduced to them by Defendants and customers identified on Defendants' contact list without paying commissions." (DE 77 at 23.) However, as the Court has discussed, there is no evidence to support this allegation. Defendants must direct the Court's attention "to those specific portions of the record upon which it seeks to rely to create a genuine issue of material fact," *In re Morris*, 260 F.3d at 655, and Defendants have not done so as to its fraudulent inducement claim related to the non-circumvention provision.

Finally, a successful claim for tortious interference would require proof of: (1) the existence of a contract between Defendants and Garden State Growers; (2) Ananda's knowledge of the contract; (3) Ananda's intent to cause a breach of that contract; (4) Ananda's actions in fact causing a breach of that contract; (5) Defendants suffering damages as a result of the breach; and (6) that Ananda enjoyed no privilege or justification for its conduct. *Seeger Enters., Inc. v. Town & Country Bank and Trust Co.*, 518 S.W.3d 791, 795 (Ky. App. 2017). The evidence in the record indicates that Ananda did not intend to cause any breach of an agreement between Defendants and Garden State Growers.[9] Defendants again have not

---

[9] *See* DE 15-3 at 14 ("Q. Okay Do you recall during that phone call if either you or David [den Hollander] and Chris [Saint-Victor] mentioned anything about Teterboro/Chief or Mr. Nice Guy or Tom and Lou and Garden State Growers' agreement with them? [Schneider:] Yes. Q. Okay. [Schneider:] Yes. Q. What do you recall being discussed? [Schneider:] I was curious about entering into this, and I was -- because I wanted to understand what the -- because of the existence of the Teterboro/Chief relationship. And I was informed that Dutch East had spoken with Teterboro/Chief about this. And it was blessed by Teterboro/Chief, that Dutch East would be able to focus on smaller retail opportunities and pursue this agreement."); *id.* at 19 ("Q. And when you say they had granted permission, do you have firsthand knowledge that Lou and Tom granted permission for Dutch East, Garden State Growers to enter into an agreement with Ecofibre/Ananda or any of the Ananda entities? [Schneider:] That was conveyed to me from -- by Dutch East. Q. And do you recall who conveyed that to you and when it was conveyed? [Schneider:] David den Hollander."); DE 19-1 at 11 ("Q. So, Chris, you're aware that at some point Ananda entered into a distribution agreement with Dutch East, correct? [Saint-Victor:] Correct. . . . Q. Okay. . . . Did David [den Hollander] ever mention the Mr. Nice Guy agreement in connection with this agreement? [Saint-Victor:] Yes, of course. Yeah. Absolutely. Because we didn't do this agreement until we got the approval of Mr. Nice Guy."); *id.* at 12 ("[Saint-Victor:] So then it became a discussion, what do you want to do with these accounts that are -- you guys deem as too small? And then David had brought up, can we sell to them directly. And then we -- then we talked to them, Tom and Lou said, yes, you can. Because David was

pointed to any portions of the record that would create a genuine issue of material fact as to that element of the claim.

While each of Teterboro's counterclaims would fail for the additional independent reasons mentioned above, there is one common element that is additionally significant: the lack of damages. As explained above, *supra* Section III.B., there are no commission payments that Teterboro is entitled to but has not received. Teterboro is not entitled to commissions on the sales made to CVS, KeHe, Wegmans, SuperValu, or Dutch East, and Teterboro is only entitled to the additional Wakefern commissions that Ananda has agreed to if and when Wakefern pays. Teterboro has offered no evidence or even specific allegations of damages beyond the claims already discussed, *supra* Section III.B.

For all of the foregoing reasons, Teterboro's counterclaims for breach of contract, fraudulent inducement, and tortious interference cannot survive summary judgment.

**D.    Damages Related to Future Sales**

Ananda seeks to foreclose Teterboro's ability to recover based on future sales to customers claimed by Teterboro, including both customers to whom sales have already been made (DE 69) and customers to whom no sales have been made (DE 71-2 at 2).

---

very, very careful. . . . So he didn't want to do anything to jeopardize that initial contract with Mr. Nice Guy. So once Tom and Lou said, yeah you guys can sell, you know, to small shops and all these little guys you have that we're not interested in, is when we went and created the contract with Dutch East Trading."); *id.* at 13 ("[Saint-Victor:] But they -- Tom was angry, and I was -- I remember being very, very, very taken aback and very, very surprised at the tone and even the topic of the conversation because we had discussed this. And we didn't move on anything until – until they were -- we were clear that it was okay with them first. So I was very, very, very surprised at the nature of the conversation."); *id.* at 25 ("Q. I believe your testimony earlier was that Dutch East sought the approval of Mr. Nice Guy to enter into this agreement, is that correct? [Saint-Victor:] That's absolutely correct, yes. . . . Q. So it's your testimony that Dutch East sought the approval of Mr. Nice Guy to enter into this agreement so that it wouldn't circumvent the Garden State Growers sales commission, is that correct? [Saint-Victor:] That's correct. Q. Okay. And Mr. Nice Guy gave you that approval or permission? [Saint-Victor:] Absolutely. David was very, very, very clear that he didn't want any -- he didn't want to do anything to jeopardize that initial agreement. So we had numerous conversations about it.").

As to the existing customers, Ananda argues that Teterboro's current predictions of future sales are too uncertain, remote, and speculative to support a damage award, Teterboro's predictions are not supported by the testimony of a qualified expert witness, and—in the event that Teterboro can make an adequate case for commissions on future sales—the only appropriate method for awarding future commissions would be by an order of specific performance.   Teterboro also concedes that specific performance would be an appropriate remedy.   (DE 77 at 13.)   This issue is almost entirely moot as a result of the Court's analysis above, *supra* Section III.B. The only remaining customer at issue is Wakefern, and Ananda has already agreed to pay Teterboro commissions on outstanding potential sales to Wakefern if and when Wakefern pays. Thus, the only remaining issue for the Court to decide is whether Ananda would be required to pay Teterboro commissions on any future sales to Wakefern beyond the ones already discussed. To do so, the Court must look at what was intended in the contract. *Moon v. Hyosung (America), Inc.*, No. 92–2064, 1994 WL 529860, at *5, (6th Cir. Sept. 28, 1994). As the Court has already acknowledged, *supra* Section III.A., there appears to be agreement that if Teterboro made an introduction that directly led to sales, Ananda would continue to pay Teterboro commissions as long as the customer continued to buy Ananda products.[10]   Accordingly, if Wakefern continues to purchase Ananda products, Ananda would be obligated to continue paying Teterboro commissions in accordance with the contract.

---

[10] *See* DE 15-5 at 35 (Ananda CEO Eric Wang: "My understanding, as long as Teterboro brought a client in for us, I would continue to pay them until that client had ceased being a client of ours, and the client being the end – the end customer who Teterboro introduced and brought on."); *id.* at 38 ("Q. In your opinion under this agreement would it be permissible for Ecofibre/Ananda to receive introductions from defendants, say, the day after the contract was entered into, April 10, 2018, and turn around and terminate 30 days later without ever paying any commissions? Mr. Jackson: Objection. [Wang:] If that client was introduced and turned into directly a client, then in my opinion that client would fall under this agreement.").

As to the customers to whom no sales have been made, Ananda argues that any future sales to any of these customers would be well beyond the term of the Sales Agreement, and Teterboro could not possibly claim to be the procuring cause of any such sales. Chuck Schneider has stated that "there is no prospect for any sales by Ananda" to the 15 companies claimed by Teterboro to whom no sales have been made. (DE 71-3 at 2.) However, this issue is insufficiently ripe for a final determination by the Court. As discussed, *supra* Section III.A., the contract allows Teterboro to recover commissions for introductions that directly led to sales. While unlikely, it is possible that one of the 15 companies claimed by Teterboro could reach out to Ananda in the future to purchase product and clearly state that they are doing so as a direct result of an introduction made by Teterboro during the term of the agreement. If that occurred, Ananda would be under no obligation to sell to that customer, but it could decide to do so. At that point, if Teterboro claimed that it should receive a commission on those sales, a new analysis would need to be undertaken, based on the specific facts and circumstances, to determine whether the sales *directly resulted* from Teterboro's introduction. In sum, Teterboro is not currently owed any commissions—as no sales have been made to the identified 15 companies—but there is a possible, albeit unlikely, factual scenario in which Teterboro might be able to make a plausible argument for commissions in the future. Accordingly, there is no current case or controversy for the Court to decide, and this issue is insufficiently ripe.

**E.    Bad Faith**

Teterboro finally alleges that Ananda breached its covenant of good faith and fair dealing by circumventing Teterboro and denying it "the benefit of the bargain." (DE 77 at 24–25.) Ananda seeks summary judgment on this issue because Teterboro did not allege such a claim in its pleadings and because Teterboro has failed to show how Ananda did anything the agreement did not allow it to do.

To demonstrate a violation of the implied covenant of good faith and fair dealing, Teterboro must provide evidence sufficient to support a conclusion that Ananda engaged in some conduct that denied Teterboro the benefit of the bargain originally intended by the parties. *Buridi v. Branch Banking and Trust Co.*, 654 Fed. App'x 802, 807 (6th Cir. 2016) (citing *O'Kentucky Rose B. Ltd. P'ship v. Burns*, 147 Fed.Appx. 451, 457–58 (6th Cir. 2005)). "An implied covenant of good faith and fair dealing, however, does not prevent a party from exercising its contractual rights." *Id.* (citing *de Jong v. Leitchfield Deposit Bank*, 254 S.W.3d 817, 824 (Ky. Ct. App. 2007)).

Teterboro has not offered evidence by which a reasonable jury could find that Ananda breached the implied covenant of good faith and fair dealing. The only pieces of evidence Teterboro points to in support of its claim are the unsupported speculation of a third party (DE 19-1 at 18) and Ananda's interactions with Garden State Growers, which the Court has addressed above, *supra* Sections III.B.5–C. These alone are insufficient to survive summary judgment, and the Court is unaware of any other evidence that would support such a claim.

## IV.

Accordingly, for the reasons set forth herein, **IT IS HEREBY ORDERED:**

(1) Plaintiffs' motion for leave to file excess pages (DE 71) is **GRANTED**;

(2) Plaintiffs' motion for summary judgment on claims for damages related to future sales (DE 69) is **GRANTED IN PART** and **DENIED IN PART** in accordance with Section III.D. of the Court's opinion;

(3) Plaintiffs' motion for summary judgment on claims for commission on sales to CVS Health (DE 70) is **GRANTED**;

(4) Plaintiffs' motion for summary judgment on Defendants' remaining claims (DE 71-2) is **GRANTED**;

(5)  The parties' pending motions in limine (DEs 41, 44, 45, 47, 48, 49, 57) are **DENIED**

as moot;

(6)  All pending deadlines and hearings are **SET ASIDE**; and

(7)  A separate Judgment will issue.

This 12th day of August, 2022.

KAREN K. CALDWELL
UNITED STATES DISTRICT JUDGE
EASTERN DISTRICT OF KENTUCKY